IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Crim. Action |
| v. | ) | No. 05-10031-01-WEB |
| | ) | |
| JOSE EDGARDO MONDRAGON, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**Memorandum and Order**

This matter came before the court on May 27, 2005, for a hearing on the defendant's motion to suppress evidence.  The court took the motion under advisement at the conclusion of the hearing.  The parties have now filed supplemental briefs summarizing their positions.  For the reasons set forth herein, the court finds the motion to suppress should be denied.

I.  *Background*.

The court finds the following facts from the evidence presented at the hearing.  On the afternoon of February 9, 2005, Kansas Highway Patrol Trooper Jeffery Patrick was patrolling Interstate 70 in Ellis County, Kansas.  Riding in the car with him was Sergeant Kelly Schneider of the Ellis County Sheriff's Department.  The officers had a trained drug-detection dog with them.  At about 4:10 p.m., Patrick turned around on the median of the highway and began to drive eastbound.  He saw a tan Chevy Avalanche that was also traveling eastward.  As Patrick came up behind the Avalanche, he saw it cross slightly onto the right-hand shoulder of the highway.  The tires on the passenger-side of the Avalanche went about six inches

over the "fog line" boundary of the right-hand lane.  After a short distance, Patrick again saw the Avalanche

cross over onto the shoulder by about a foot and a half -- this time for several seconds -- before it moved

back into its lane.  The weather at the time was sunny and clear, with a light breeze, and Patrick saw no

conditions that would have made it impracticable for a driver to maintain a single lane of travel.  He believed

the driver had committed a traffic violation.[1]  Patrick pulled up closer to the Avalanche and saw that it had

a temporary cardboard registration on the back.

      Patrick turned on his emergency lights to stop the vehicle, and the Avalanche pulled over to the side

of the road.  The ensuing traffic stop was recorded on videotape, although the body microphone worn by

the Trooper malfunctioned for an extended period such that only a portion of the roadside conversation

was recorded.  (Govt. Exh. 1).  Because the ground on the passenger side of the vehicle was muddy,

Patrick approached the Avalanche on the driver's side.  When he got to the driver's side window, Patrick

saw there were two men inside - the driver and one passenger who was laying down.  Because Patrick was

exposed to traffic on the driver's side of the vehicle, he asked the driver, defendant Jose Mondragon, to

come speak with him behind the vehicle.  Mondragon got out and retrieved a jacket from the back seat

of the Avalanche.  Patrick asked for his driver's license, which Mondragon produced.  Patrick told Sgt.

Schneider, who had gotten out of the patrol car, that there was another person in the vehicle.  Schneider

went up to talk to the passenger while Patrick spoke to Mondragon.  Patrick asked Mondragon about the

vehicle and the temporary registration.  Mondragon explained that he had just purchased the vehicle.  He

---

[1] Section 8-1522(a) of the Kansas Statutes provides in part that "[w]henever any roadway has been divided into two (2) or more clearly marked lanes for traffic, ... vehicle[s] shall be driven as nearly as practicable entirely within a single lane."

said he had the permanent (Arizona) tags for the vehicle but had not put them on yet.  Patrick also asked

about Mondragon's trip and where the men were headed.  Mondragon said he and the passenger were

long-time friends who were coming from Arizona and were on their way to Chicago to attend a friend's

wedding and a reunion with some buddies.  Mondragon said the wedding was on Saturday [i.e., in three

days], and that the men would be gone for a couple of weeks.  Schneider, meanwhile, spoke with the

passenger and obtained the insurance and registration information for the vehicle from him.  He also

obtained the passenger's driver's license.  Schneider asked the passenger about the men's travel plans, and

he understood the passenger to say that they were attending a friend's wedding in Chicago the following

day, and that the men would be gone for about a week and a half.

        After a few minutes, Patrick and Schneider returned to the patrol car to check on the men's

documents, while the defendant returned to the Avalanche.  All of the documents appeared to be in order.

Patrick discussed the statements of the two men with Schneider and noted that the information about the

wedding seemed implausible or inconsistent, and said they should ask the men again about it.  Patrick wrote

up a warning citation for Mondragon's failure to maintain a single lane of travel.  When this was done, he

and Schneider got out, and Patrick again asked Mondragon to join him behind the Avalanche.  Patrick

returned Mondragon's documents as Schneider went back to the passenger compartment and gave the

passenger back his documents.  Patrick explained to Mondragon that he had had to check on the

temporary registration.  He also asked Mondragon again about the wedding they were going to attend.

When Mondragon said it was on Saturday, Patrick noted that he thought the passenger told him it was

scheduled for the following day.  Mondragon said, no, it was Saturday.  In response to Patrick's questions,

Mondragon said that his passenger was not a friend of the guy getting married, but that Mondragon had

invited him along so Mondragon did not have to travel alone.  The conversation between Mondragon and

Patrick was friendly and cordial.  [When Patrick asked Mondragon about the date of the "funeral," instead

of "wedding," Mondragon laughed and said the two were in fact the same thing.].  Patrick then asked

Mondragon, "You don't have anything illegal in your truck before you go, any weapons, contraband,

drugs?" Mondragon said, "No, no, definitely [not]" as Patrick continued, "'Pistolas,' dead bodies?" When

Mondragon said again, "No, no," Patrick asked, "Do you mind if we take a look?"  Mondragon said,

"Sure," motioning toward the back of the truck and volunteering, "You want me to open the truck?"

Patrick responded, "Yeah, if you don't mind."  Mondragon stepped over to the truck and opened the rear

tail gate.  After he did so, he stepped aside and said it was just the men's luggage in the back of the truck.

The pickup bed area of the Avalanche had a hard cover over it, which meant the officers would

have to lay or crouch under the cover to examine it.  After Mondragon opened the tail gate, Patrick asked

him if he would mind being patted him down for safety reasons.  Mondragon indicated it was okay, and

Patrick patted him down.  Patrick explained that they had a lot of drugs and criminal stuff moving on the

highway.  Mondragon responded that it was no problem.  Patrick then asked the passenger to step out,

explaining that they were going take a quick look in the truck to make sure there was nothing illegal in it.

Patrick also patted down the passenger.  He asked the two men to stand out in front of the Avalanche.

The officers then examined the rear bed area and wheel wells of the Avalanche.  Patrick testified

the Chevy Avalanche is well-known as a drug transportation vehicle because it has natural voids under the

bed liner that can only be accessed by removing the liner with a special tool.  The officers examined the

bolts holding down the bed liner.  Patrick, who has some experience working on cars in a body shop,

determined that the bolts showed signs of significant wear, indicating that they had been removed several

4

times.  The officers looked at the rear bed liner, tail gate, and fender area.  After several minutes of examination, they decided to use their drug detection dog on the vehicle.  The dog was retrieved from the patrol car and shown the rear area and bed of the vehicle.  After a few minutes, the dog appeared to get excited about an area in the rear of the pickup bed.  A few minutes later, another team of officers arrived with another drug dog,  and that dog exhibited similar behavior, getting excited and scratching in the rear area of the pickup bed.  At that point, the officers asked the two men to follow then to the station in the vehicle.  At the station, officers thoroughly searched the Chevy Avalanche and found a large amount of cocaine hidden therein.

II. *Motion to Suppress*.

Defendant's initial motion to suppress argued that the stop of the defendant's vehicle was made in the absence of probable cause to believe a traffic violation had occurred.  Defendant's supplemental brief in support of his motion additionally argues that even if the initial stop was valid, the Trooper's continued detention and questioning of the defendant exceeded the permissible scope of the traffic stop, because the officer did not have any reasonable suspicion of criminal activity and the encounter was not consensual. It further argues that Mr. Mondragon's purported consent to the search cannot serve as justification for the search, because the consent was a product of the unlawful detention.

III. *Discussion*.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The temporary detention of an individual for a traffic violation constitutes a seizure within the meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809-10 (1996).  Under Tenth Circuit law, routine traffic stops are analyzed under

the standards for investigatory stops in *Terry v. Ohio*, 392 U.S. 1 (1968). *See United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir.1998). The reasonableness of such stops are evaluated in two respects: first, whether the officer's action was justified at its inception, and, second, whether the stop is reasonably related in scope to the circumstances that first justified the interference. *United States v. Gonzalez-Lerma*, 14 F.3d 1479, 1483 (10th Cir.1994) (*citing Terry v. Ohio, supra* ).

A. *Traffic Stop and Detention.* "[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir.1995) (en banc ); *Whren v. United States*, 517 U.S. 806, 818 (1996). Based on the uncontroverted testimony of the Trooper, which the court finds credible, the court concludes the officer had probable cause to believe the defendant committed a traffic violation by crossing the lane line. There is no evidence that the conditions would have made it impracticable for a driver to maintain a single lane of travel, and the defendant's instances of crossing the line constituted sufficient grounds to believe a violation had occurred. *Cf. United States v. Gregory*, 79 F.3d 973 (10th Cir. 1996) (single instance of crossing the line in a high wind did not give rise to probable cause under Utah statute).

The Tenth Circuit has consistently held that an officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation. *United States v. Gonzalez-Lerma*, 14 F.3d 1479, 1483 (10th Cir.1994). Thereafter, when the driver has produced a valid license and proof that he is entitled to operate the car, he generally must be allowed to proceed on his way without being subjected to further delay for additional questioning. *Id.* Further questioning is permissible in two circumstances, however. First, the officer may detain the driver for questioning unrelated to the initial

6

traffic stop if the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring.  *United States v. Soto*, 988 F.2d 1548, 1554 (10th Cir.1993).  Second, further questioning is permissible if the initial detention has become a consensual encounter.  *United States v. Dewitt*, 946 F.2d 1497, 1502 (10th Cir.1991).

The court rejects any suggestion that this traffic stop was unreasonable by virtue of the officers' questions to the defendant and his passenger about their travel plans.  The courts have said on numerous occasions that ordinary questions about travel plans do not render a traffic stop unreasonable.  *Cf. United States v. Williams*, 271 F.3d 1262, 1266 (10th Cir.2001) ("[W]e have repeatedly held (as have other circuits) that questions relating to a driver's travel plans ordinarily fall within the scope of a traffic stop.").  Moreover, where a driver has been stopped due to erratic driving or weaving on the highway -- as in the instant case -- questions pertaining to travel plans may shed light on the driver's actions and may also be relevant to ensuring public safety.  Additionally, the presence of a temporary license tag on a vehicle provides some objective basis for an officer to briefly inquire about the driver's travel.  In sum, the fact that the officers asked the men a few questions about their travel plans does not render the detention unreasonable.

As noted above, once the Trooper confirmed the validity of the documents and licenses and issued a warning citation, he was required to allow the defendant to proceed on his way without further delay unless the encounter was consensual or the officer had an objectively reasonable suspicion of criminal activity.  The evidence showed that this encounter could not be characterized as consensual.  Although Patrick returned the defendant's license and other documents to him before asking about contraband in the truck, he gave no indication to the defendant that the traffic stop was concluded or that he was free to go.

He never conveyed to the defendant that he was free to leave, and he continued to ask questions without any apparent break or visible indication that the official detention was ended.  In fact, he indicated to Mr. Mondragon that he wanted to ask some additional questions about illegal substances in the truck "before you go."  The court concludes that a reasonable person under these circumstances would not have felt free to disregard the officer's inquiry and leave. *See United States v. Elliot*, 107 F.3d 810, 813, 814  (10th Cir. 1997) (a consensual encounter occurs where a reasonable person would feel free to disregard the police and to go about his business).

The defendant's continued detention after the citation was issued thus had to be based on a reasonable suspicion of criminal activity to comport with the Fourth Amendment.  An officer's investigatory stop of a person that falls short of a traditional arrest is reasonable under the Fourth Amendment if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot. *United States v. Sokolow*, 490 U.S. 1, 7 (1989).  In determining whether an officer had reasonable suspicion to detain an individual, a court must look at the totality of the circumstances.  *United States v. Arvizu*, 534 U.S. 266, 273 (2002).  "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Id.*  Although it presents a close question here, the court concludes that the officer had an objectively reasonable suspicion of criminal activity which justified a brief detention to ask about contraband and to seek permission to search.  The court notes that the officer was aware that the two men were on a cross-country trip from the southwest United States to Chicago, on a highway where drugs are frequently transported, and they gave somewhat conflicting accounts of their travel plans. *Cf.  United States v. Kopp*, 45 F.3d 1450, 1453-54 (10th Cir.1995) (implausible travel plans can

8

contribute to reasonable suspicion).  The officer was also aware that the defendant's vehicle had been

recently purchased and was of a type known to be popular with drug smugglers because of its unique

configuration.  *See United States v. McRae*, 81 F.3d 1528, 1534 (10th Cir.1996) (in assessing what

constitutes an objectively reasonable suspicion of illegal activity, courts defer to the ability of a trained law

enforcement officer to distinguish between innocent and suspicious actions).  Although these facts fall far

short of the level of justification required for a full-fledged arrest or search, they do provide the objective

minimal level of justification required for a brief detention to resolve the ambiguity.  *See Illinois v.*

*Wardlow*, 528 U.S. 119, 123-24 (2000) (the Fourth Amendment requires at least a minimal level of

objective justification for a *Terry* stop; the officer must be able to articulate more than an "inchoate and

unparticularized suspicion or 'hunch' of criminal activity." ).  In sum, the court finds that the officer's

momentary detention of the defendant to ask him about contraband and to ask for permission to search his

truck was reasonable under the Fourth Amendment.

B. *Consent*.  The Government contends the defendant voluntarily consented to a search.  A valid

search may be made of a vehicle without a warrant or probable cause when a person in control of the

vehicle has given his voluntary consent to search.  *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973).

To be valid, consent must be freely and voluntarily given. *United States v. Patten*, 183 F.3d 1190, 1194

(10th Cir.1999).  Voluntariness is a question of fact to be determined from the totality of the circumstances.

*Schneckloth*, 412 U.S. at 227.  The government must prove by a preponderance of the evidence that

consent was freely and voluntarily given. *United States v. Soto*, 988 F.2d 1548, 1557 (10th Cir.1993).

To meet its burden, the government first must present clear and positive testimony that consent was

unequivocal and freely and intelligently given. *United States v. Pena*, 143 F.3d 1363, 1367 (10th

Cir.1998).  The government also must prove that the officers used no implied or express duress or coercion

in obtaining the consent.  *Id.*  The government does not discharge its burden "by showing no more than

acquiescence to a claim of lawful authority."  *Bumper v. North Carolina*, 391 U.S. 543, 549 (1968).

The evidence shows clearly that the defendant voluntarily consented to a search of his vehicle.  The

evidence shows that the Trooper asked for the defendant's permission to search the vehicle.  In response,

Mondragon promptly and enthusiastically said, "Sure."  He then volunteered to open up the back of the

truck to let the officer look, even as Patrick again emphasized the permissive nature of the search, asking

to look "if you don't mind."  The defendant's words and actions, as well as the totality of the circumstances,

show that the consent was clear and unequivocal and that it was freely and voluntarily given.  The officer

used no show of authority to suggest that compliance was required.  The encounter took place in the

daylight on the side of a busy interstate highway.  The defendant's actions during the encounter show that

he was relaxed and at ease talking to the Trooper and that his consent was not the product of any coercion,

notwithstanding the fact that he was being detained at the time he gave consent.  *Cf. United States v.*

*Orrego-Fernandez*, 78 F.3d 1497, 1504 (10th Cir. 1996).

The court further finds that the Trooper's subsequent actions and his use of the dogs to examine

the vehicle were within the scope of the consent granted.   The general standard for measuring the scope

of consent is that of "objective reasonableness." *United States v. Pena*, 143 F.3d 1363, 1367 (10th

Cir.1998).   A reasonable person would have understood the exchange between the officer and the

defendant as granting consent to look anywhere in the vehicle that drugs might be found.  *United States*

*v. Bustillos-Munoz*, 235 F.3d 505, 515 n. 5 (10th Cir.2000).  The defendant's general consent, without

any limitation, would also be understood by a reasonable person as permitting the officer to use the drug-

10

detecting dogs on the vehicle. The uncontroverted testimony is that the dogs alerted to the back of the vehicle, thereby giving rise to probable cause to believe the truck contained illegal drugs, and justifying the subsequent search of the vehicle at the station. *See United States v. Ludwig*, 10 F.3d 1523, 1527 (10th Cir.1993) (trained canine alert by itself may provide probable cause for search); *United States v. Rosborough*, 366 F.3d 1145, 1152 (10th Cir.2004) (same). *See also United States v. Ross*, 456 U.S. 798, 809 (1982) (warrantless search of an automobile is reasonable if there is probable cause to believe it contains contraband).

The court notes the defendant argues his consent was invalid because it was the product of an unlawful detention. As noted above, the court rejects the argument that the defendant was unlawfully detained. Even if it were to find that reasonable suspicion for a detention was lacking, however, the court would have to conclude that the consent for this search was nevertheless valid. A search preceded by a Fourth Amendment violation may still be valid if the defendant's consent to that search was voluntary in fact under the totality of the circumstances. *United States v. Caro*, 248 F.3d 1240, 1247 (10th Cir. 2001). In such cases, the government bears the heavy burden of showing that the primary taint of the violation was purged. *Id*. To satisfy its burden, "the government must prove, from the totality of the circumstances, a sufficient attenuation or 'break in the causal connection between the illegal detention and the consent.'" *Id*. (*citing United States v. Gregory*, 79 F.3d 973, 979 (10th Cir.1996)). In making this determination, the court examine all of the facts, including the factors identified in *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975). Those factors include: (1) the temporal proximity of the illegal detention and consent, (2) any intervening circumstances, and (3) the purpose and flagrancy of any official misconduct. Although there was no separation in time between the detention and the consent, the circumstances under which consent

11

was granted show that it was valid.  In this case, the lack of any coercive questions or actions by the officer

and the clear and voluntary nature of the consent granted, as well as the absence of evidence suggesting

the officer purposefully exploited an unlawful detention, all lead the court to conclude that the consent was

sufficiently an act of free will to purge any taint arising from the detention.  *Cf. United States v. McSwain*,

29 F.3d 558, (10th Cir. 1994) (officer's coercive actions contributed to finding of taint).  The officer's

phrasing of his request to search in permissive fashion clearly conveyed to the defendant that his compliance

with the request was purely voluntary.  The evidence of voluntariness is sufficient in this instance to

overcome the absence of any intervening time or circumstances between the detention and the granting of

consent.  Accordingly, the court concludes that the defendant's consent for the search was valid regardless

of whether the officer had reasonable suspicion for a detention.

IV.  *Conclusion*.

The defendant's motion to suppress evidence (Doc. 21) is DENIED.  IT IS SO ORDERED this

6th    day of June, 2005, at Wichita, Ks.

s/Wesley E. Brown
Wesley E. Brown
U.S. Senior District Judge